**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | No. 18-CR-31-CJW |
| vs. | | **ORDER** |
| GREGORY SCOTT STEPHEN, | | |
| Defendant. | | |

———————————

TABLE OF CONTENTS

I.   INTRODUCTION.................................................................................2

II.  FACTUAL BACKGROUND.................................................................2

   A. Defendant and Vaughn Ellison..........................................................2

   B. Discovery and Seizure of the USB Device...........................................3

   C. Mr. Ellison's Delivery of the USB Device to the Police ..........................4

   D. Law Enforcement Search of the USB Device .......................................6

   E. Interview of Defendant and Searches of his Residences............................7

   F. Defendant's Arrest and Detention on Federal Charges ..............................8

III.  ANALYSIS .....................................................................................9

   A. Defendant's Motion to Dismiss.......................................................10

   B. Defendant's Motion to Suppress—Agency Theory ................................11

   C. Defendant's Motion to Suppress—Acceptance as Seizure Theory ...............15

   D. Defendant's Motion to Suppress—Lack of Probable Cause Theory ..............20

   E. Defendant's Motion to Suppress—Overbroad, General Search Theory...........23

   F. Defendant's Motion to Suppress—Franks Theory .................................26

   G. Government's Motion to Strike.......................................................29

IV.  CONCLUSION...............................................................................30

# *I.    INTRODUCTION*

This case is before the Court pursuant to defendant's Motion to Dismiss (Doc. 11),[1] Motion to Suppress (Doc. 12), and Motion for a *Franks* Hearing. (Doc. 41). Defendant filed additional "supplements" to these motions. (Docs. 13, 40, & 44). Also before the Court is the government's Motion to Strike one of those supplements at Doc. 44. (Doc. 48). On September 27, 2018, the Court held a hearing on these motions. Vaughn Ellison, Monticello Police Chief Britt Smith, and Iowa Division of Criminal Investigation ("DCI") Special Agent Ryan Kedley testified at the hearing. (Doc. 50-1). The Court also accepted into evidence government's Exhibits 1[2] through 4 and defense exhibits M, R, T, W1, W2, W3, and X. (*Id.*) The Court also heard argument from the parties on the motions. (Doc. 50).

For the following reasons, the Court **denies** all of the motions.

# *II.    FACTUAL BACKGROUND*

## *A.    Defendant and Vaughn Ellison*

Defendant is a resident of Monticello, Iowa, and also has a home in Delhi, Iowa. Defendant is the cofounder of the Iowa Barnstormers Youth Basketball Organization. Defendant traveled with young boys throughout the United States in connection with this organization.

Vaughn Ellison is a resident of Monticello, Iowa, and owns a construction company. Mr. Ellison is defendant's former brother-in-law. They remained friends after Mr. Ellison ended his marriage to defendant's sister. Many years before, Mr. Ellison

---

[1] All references to the docket pertain to Case No. 18-CR-31, unless otherwise specified.

[2] Exhibit 1 is a copy of videos from a USB device depicting minors in various states of nudity and using a bathroom and shower. According to the government, it constitutes contraband and, therefore, the exhibit has been retained by the government. The Court finds it unnecessary to view the videos to reach a decision on the merits of the pending motions.

saw computer-printed images of naked boys in defendant's possession, along with some computer discs with references to nudity and "XXX." Mr. Ellison was aware that defendant often had young boys staying at defendant's residence in connection with basketball trips. Defendant had previously coached Mr. Ellison's sons in basketball when Mr. Ellison's sons were minors.

### B. Discovery and Seizure of the USB Device

From about December 2017, to mid-February, 2018, Vaughn Ellison, one of his adult sons, and other subcontractors performed home remodeling on defendant's house in Monticello, Iowa. Mr. Ellison was performing this work on defendant's house as part of Mr. Ellison's business and for compensation. Defendant provided Mr. Ellison with a code to enter the front door of defendant's residence. Defendant gave Mr. Ellison and his workers the freedom to come and go from the residence, and to move about within the residence, as needed to complete their work. This included use of the bathrooms.

On the morning of Thursday, February 15, 2018, Mr. Ellison used the bathroom in defendant's home and observed a USB device on the tank of the toilet. Mr. Ellison recognized the USB device as one disguised to look like a phone charger but capable of secretly recording video images. Mr. Ellison was curious about why that USB device was in the bathroom and what images may have been recorded on the USB device. Mr. Ellison took the USB device and put it in his pocket, where it remained for the day.

Mr. Ellison returned the following day, Friday, February 16, 2018, with his adult son to work on defendant's house. Shortly after they arrived, at about 8:00 a.m., Mr. Ellison's son opened a door to a bedroom to work on the flooring. There, he discovered a young boy sleeping in the bed. The bedroom was adjacent to the bathroom where Mr. Ellison had discovered the USB device. Later that morning, defendant returned to his house with another young boy and picked up the boy who had been sleeping, explaining

to Mr. Ellison that defendant was taking the boys to a basketball event. Defendant introduced the boys to Mr. Ellison by name.

That evening, Mr. Ellison connected the USB device to his home computer and viewed the images. The USB device contained "at least" 50 videos, each about two to three minutes in length, and three folders identified with male first names. Mr. Ellison recognized one of those names as belonging to one of the boys he met that morning. Inside each of those folders were duplicates of the videos that were unorganized on the USB device. Mr. Ellison looked at each of the video clips, at least for some period of time. The videos showed what appeared to be a hotel bathroom. The USB device was positioned to have a view of the toilet and an area immediately in front of a shower. Although many of the video clips showed an empty bathroom, many others showed young boys using the toilet or undressing, entering the shower area, then emerging wet. The videos showed the boys' genitals. Some of the videos also showed defendant using the toilet.

### C. Mr. Ellison's Delivery of the USB Device to the Police

The following night, Saturday, February 17, 2018, Mr. Ellison discussed with his girlfriend what he observed on the USB device. After further discussions the following morning with his girlfriend, Mr. Ellison decided that he needed to contact the police. At approximately 1:44 p.m. on Sunday, February 18, 2018, Mr. Ellison sent a text message to Monticello Police Chief Britt Smith. The text message stated that Mr. Ellison needed to talk to Chief Smith "about a situation I stumbled on, illegal and kind of close to me, that in [sic] not sure how to handle." (Doc. 54-2). Chief Smith replied that he was eating lunch then, but would call him later. (*Id.*).

Chief Smith spoke with Mr. Ellison later that Sunday evening. During the conversation, Mr. Ellison described finding and taking the USB device, his review of the videos on the USB device, and the images he observed in the videos. Mr. Ellison told

Chief Smith that he did not know what to do with the USB device. Chief Smith directed Mr. Ellison to drop off the USB device at the police station the following day.

During the conversation, Mr. Ellison also stated that he had not yet been paid for the work performed at defendant's house and was worried about getting paid, depending on what may happen as a result of the images on the USB device. Mr. Ellison explained that he was supposed to be paid on Monday, February 19, 2018. Chief Smith acknowledged that Mr. Ellison had a valid reason to be concerned and told Mr. Ellison to let him know when Mr. Ellison got paid. Defendant paid Mr. Ellison approximately $22,000 on Tuesday, February 20, 2018, for the work Mr. Ellison had performed on defendant's house. At some point, Mr. Ellison informed someone in law enforcement that he had been paid. Additionally, Mr. Ellison related that defendant was aware the USB device was missing and was looking for the USB device.

On Monday, February 19, 2018, at approximately 8:00 a.m., Mr. Ellison delivered the USB device to a receptionist at the Monticello Police Department. When Chief Smith arrived at the police department at approximately 9:00 a.m., the USB device was in a zip-lock baggie on his desk. Chief Smith placed the USB device in an evidence locker. Based on Mr. Ellison's description of the video images on the USB device, Chief Smith considered the USB device to be contraband.

Mr. Ellison had no prior working relationship with law enforcement officers. He never worked as an informant, had never been paid by law enforcement officers, and had never been provided any benefit from law enforcement officers in the form of dropped or reduced charges or of any other kind. Mr. Ellison could not recall why he had Chief Smith's telephone number in his contact list on his phone, but believed he might have obtained it in connection with his contacting the police department the prior year when someone stole items from Mr. Ellison's construction trailer. Chief Smith had Mr. Ellison's telephone number in his contact list on his work/personal cell phone as well.

Chief Smith explained that in a small town like Monticello, it is part of his duties to know the people living there, and that he had the contact information for many citizens. Mr. Ellison and Chief Smith do not socialize together and described themselves as only acquaintances, not friends. Chief Smith testified that he did not consider charging Mr. Ellison with theft for taking the USB device from defendant's home because: (1) he did not believe Mr. Ellison intended to permanently deprive defendant of possession of the USB device had it not contained illegal images, and (2) he did not believe charges were appropriate when a citizen did the morally correct thing of reporting suspected criminal activity and acting to protect the public.

### D. Law Enforcement Search of the USB Device

Later on Monday morning, February 19, 2018, Chief Smith contacted DCI Special Agent in Charge ("SAC") Rick Rahn, regarding the USB device and the information Mr. Ellison had told Chief Smith about what was on the USB device. SAC Rahn told Chief Smith that he would assign an agent to the case. SAC Rahn initially assigned the case to a DCI Special Agent in Cedar Rapids, Iowa, but that agent was ill and was unable to respond to the Monticello Police Department to begin the investigation for several days. When that agent's illness continued to Wednesday, February 21, 2018, SAC Rahn reassigned the case to Special Agent Kedley.

That same day Special Agent Kedley met with Chief Smith at the Monticello Police Department. Chief Smith described to Special Agent Kedley what Mr. Ellison had told Chief Smith about the discovery of the USB device, Mr. Ellison's taking and reviewing of the video images on the USB device, and the nature of the images captured on the videos. Based on this description, Special Agent Kedley thought there was probable cause to believe the USB device contained evidence of a violation of Iowa law. In particular, Special Agent Kedley believed the USB device would contain evidence of a

violation of Iowa Code § 728.12 (Sexual Exploitation of a Minor), and § 709.21 (Invasion of Privacy).

Special Agent Kedley then drafted an application for a warrant to search the USB device. Later that day, Wednesday, February 21, 2018, Special Agent Kedley presented the application to a state magistrate judge, who signed the search warrant. (Doc. 54-3). The affidavit in support of the search warrant stated that Mr. Ellison described the videos as containing "footage of young males showering in what appeared to Ellison to be a hotel shower." Once the warrant was signed, Special Agent Kedley took possession of the USB device from the Monticello Police Department's evidence room and transported it to Cedar Rapids, where another agent trained in forensic examination of electronic devices accessed the USB device, made a mirror image of its contents, and then viewed the video images on the USB device with Special Agent Kedley. Special Agent Kedley found that the USB device contained the images described by Mr. Ellison.

### E.    Interview of Defendant and Searches of his Residences

On Thursday, February 22, 2018, Special Agent Kedley and his partner interviewed defendant at his place of employment. During the interview, defendant made incriminating statements. In conducting the interview, the agents disclosed to defendant that they had viewed the contents of the USB device. They also informed him that they had obtained search warrants for each of his residences.

In the affidavits in support of the search warrants for defendant's homes, Special Agent Kedley again repeated the same language used in the warrant for the USB device to describe what Mr. Ellison said was contained on the USB device. The affidavits also related the agent's own review of the images and described them as showing "young, non-adult male individuals disrobing to the point of nudity with genitalia exposed to the camera." In the final paragraph of the affidavit, Special Agent Kedley added:

Through my knowledge, training and experience, I know a complete search of the above-noted residence and person of STEPHEN could be crucial in identifying potential additional child pornographic images, child pornographic videos, additional victims who either knowingly or unknowingly were video recorded by STEPHEN and have been subjected to the unlawful manufacturing of child pornography and invasion of privacy, as well as any other evidence of child pornography associated with STEPHEN.

The Honorable Ian Thornhill, Iowa District Court Judge, signed the warrants. On the Endorsements of the warrants, Judge Thornhill summarized additional information Special Agent Kedley provided orally to Judge Thornhill. Specifically, Judge Thornhill wrote:

Affiant indicates that based on his history & experiences & consult with other agents that individuals who engage in child pornographic activities often keep and store copies of images & videos on multiple electronic storage devices in various locations.

(Docs. 54-4, at 6; 54-5, at 6). Generally speaking, the search warrants for defendant's residences (Docs. 54-4, 54-5) authorized the search and seizure of electronic devices that could contain images (pornographic and nonpornographic) of children and adults.

### F. Defendant's Arrest and Detention on Federal Charges

On March 13, 2018, defendant was arrested on a criminal complaint charging him with knowingly transporting child pornography, in violation of Title 18, United States Code, Section 2252(a)(1). (18-MJ-0074, Docs. 2, 8). On March 21, 2018, United States Magistrate Judge Kelly Mahoney presided over a detention hearing, at the conclusion of which she ordered defendant detained pending trial. (18-MJ-0074, Docs. 21, 22). On April 4, 2018, defendant appealed Judge Mahoney's detention order to the district court. (18-MJ-0074, Doc. 23). On April 5, 2018, a grand jury indicted defendant. (Doc. 2). On April 5, 2018, defendant filed a Motion for Review and Revocation of the Magistrate's Pretrial Detention Order. (Doc. 3). On April 17, 2018, United States

District Court Judge Linda R. Reade issued an order denying defendant's motion to revoke the detention order. (Doc. 10). In discussing the detention factors in her order, Judge Reade found that the evidence was strong that defendant violated Title 18, United States Code, Section 2252, which makes it a crime to transport child pornography. In her analysis, Judge Reade reviewed the law defining child pornography.

### III.    ANALYSIS

Defendant moves to dismiss the indictment, arguing that, in ordering the defendant detained pending trial, the Court adopted a definition of child pornography that now establishes "the law of the case," and that definition, as applied to defendant, violates his First Amendment rights and his right to privacy. (Docs. 11, 11-1). Defendant moved to suppress evidence from the USB device, and all derivative evidence, on the grounds that: (1) the government's acceptance of the USB device from Mr. Ellison constituted a warrantless search and seizure of the USB device by the government, and; (2) the warrants for both the USB device and defendant's homes were overbroad, general warrants. (Docs. 12, 12-1). In a supplement to his motion to suppress, defendant further argued that the warrant to search the USB device lacked probable cause. (Doc. 13). In yet another supplement to his motion to suppress, defendant expanded upon his prior arguments, and further argued that Chief Smith violated defendant's Fourth Amendment right when Chief Smith "seized" the USB device when he got it from Mr. Ellison, and kept it for two days without a warrant. (Doc. 40). In another supplemental motion, defendant moved to suppress evidence from the search on the ground that Special Agent Kedley allegedly made materially false and misleading statements in the affidavits in support of the search warrants. (Doc. 41). Defendant again supplemented this supplement by submitting a report from an expert in computer forensics, who opined that the images on the USB device do not constitute child pornography. (Doc. 44). The

government moves to strike the latest supplement on timeliness and other grounds. (Doc. 48). The Court will address each of parties' arguments in turn.

### A. *Defendant's Motion to Dismiss*

Defendant's motion to dismiss (Doc. 11) seeks dismissal of Count Seven of the Superseding Indictment, which charges transportation of child pornography, based on the First and Fourteenth Amendments to the United States Constitution. Although defendant advances an overbreadth challenge under the First Amendment and a right to privacy challenge under the Fourteenth Amendment, the crux of the two arguments is the same. (*See* Doc. 11-1). Specifically, defendant argues that, in reviewing Judge Mahoney's detention order, the Court misinterpreted the relevant statute and determined "the law of the case at bar" to be "that a depiction of otherwise innocent conduct can be 'sexually explicit conduct.'" (Doc. 11-1, at 3). Such an interpretation, defendant reasons, is "unconstitutionally overbroad as applied to the facts of [this] case," and amounts to a violation of defendant's First Amendment right to free speech and his Fourteenth Amendment right to privacy. (*Id.*, at 3-4).

The Court did not, however, misinterpret the law, nor create "the law of the case at bar," in reviewing Judge Mahoney's detention order. Defendant has twisted the Court's reasoning. Defendant has taken out of context a quote that the Court used as additional authority to help define "lascivious exhibition" as evidence that the Court had defined child pornography to include depictions that are not lascivious, and then argued that defendant has a First Amendment right to possess such images because they aren't child pornography. When determining whether a defendant may be released pending trial, a court "shall . . . take into account the available information concerning . . . the weight of the evidence against the person . . . ." 18 U.S.C. § 3142(g)(2). It was in considering the weight of the evidence against defendant that the Court noted that "'otherwise innocent conduct'" *could* be construed as sexually explicit conduct, "'based

on the actions of the individual creating the depiction.'" (Doc. 10, at 4 (quoting *United States v. Holmes*, 814 F.3d 1246, 1251-52 (11th Cir. 2016))).

The Court's citation to *Holmes* does not amount to a holding that the conduct alleged in the instant case is sufficient to turn "otherwise innocent conduct" into sexually explicit conduct. Rather, the Court's citation to *Holmes* explains that defendant's admission "that he recorded the images in question out of a 'sexual curiosity' and that he became aroused while viewing them," together with the secretive nature surrounding the creation of the recordings, amounted to "strong" evidence that the conduct in the recordings could be considered sexually explicit conduct. (*Id.*). In finding the evidence strong, the Court merely turned to one interpretation of the relevant statute to determine the strength of the evidence against defendant when such evidence was considered in light of the statute. That consideration did not inherently invoke *Holmes* as the law of the case at bar. Because defendant's First and Fourteenth Amendment arguments both rest on the assertion that *Holmes* was adopted as the law of the case, defendant's motion to dismiss (Doc. 11) is **denied**.

## B. *Defendant's Motion to Suppress—Agency Theory*

Defendant argues that the Court should suppress evidence because the government's acceptance of the USB device from Mr. Ellison constituted a warrantless search and seizure of the USB device by the government. (Docs. 12-1, at 3-5; 13, at 1-3; 40-1, at 2-7). In other words, defendant argues Mr. Ellison was working as an agent for the government when he seized and searched the USB device. Defendant acknowledges that a wrongful search of seizure by a private party, and not the government, does not constitute a violation of the Fourth Amendment. (Doc. 12-1, at 3). Defendant argues, however, that the government's acquiescence in Mr. Ellison's unlawful taking of the USB device from defendant's house converts the private taking to an act of the government. (Docs. 12-1, at 3-5; 13-1, at 2-3; 40-1, at 2).

The Fourth Amendment guarantees the right of citizens to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. As the Supreme Court has long held, however, this protection extends only to actions undertaken by government officials or those acting at their direction. *See Burdeau v. McDowell*, 256 U.S. 465, 475 (1921) (holding that the Fourth Amendment applies to government action, and not that of a private party); *see also Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614 (1989) (holding that "the Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on his own initiative" but it does "protect[ ] against such intrusions if the private party acted as an instrument or agent of the Government."). "Whether a private party should be deemed an agent or instrument of the government for Fourth Amendment purposes necessarily turns on the degree of the government's participation in the private party's activities, a question that can only be resolved in light of all the circumstances." *United States v. Wiest*, 596 F.3d 906, 910 (8th Cir. 2010) (quoting *Skinner*, 489 U.S. at 614). In evaluating agency in the Fourth Amendment context, courts focus on three relevant factors: "[1] whether the government had knowledge of and acquiesced in the intrusive conduct; [2] whether the citizen intended to assist law enforcement or instead acted to further his own purposes; and [3] whether the citizen acted at the government's request." *United States v. Highbull*, 894 F.3d 988, 992 (8th Cir. 2018) (quoting *Wiest*, 596 F.3d at 910). "A defendant bears the burden of proving by a preponderance of the evidence that a private party acted as a government agent." *Id*.

Applying the *Wiest* factors to this case, defendant has not shown to a preponderance of the evidence that Mr. Ellison was acting as an agent of the government, therefore his conduct did not violate defendant's constitutional rights. The evidence in the record shows that the government had no knowledge of Mr. Ellison's conduct in taking and viewing the contents of the USB device until days after Mr. Ellison had done

so. Mr. Ellison testified that he took and viewed the USB device because of his own curiosity about why the USB device was in the bathroom. He was especially concerned due to having seen defendant in possession of photographs of naked boys years before, and because of defendant's position bringing him into contact with young boys. There was no evidence that Mr. Ellison was motivated at the time he took and viewed the USB device to assist law enforcement officers.[3] Indeed, Mr. Ellison struggled for two days trying to figure out what to do with the USB device. Moreover, even if Mr. Ellison were motivated in part to aid law enforcement because he thought it was possible that defendant was using the USB device for an unlawful purpose, that alone would not transform him into a government agent. *See United States v. Smith*, 383 F.3d 700, 705 (8th Cir. 2004) (holding that even if a "private citizen is motivated in part by a desire to aid law enforcement," that "does not in and of itself transform her into a government agent."). Finally, the record is clear that Mr. Ellison did not act at the government's request when he took and viewed the contents of the USB device. The Court's conclusion that Mr. Ellison was not acting as an agent for the government is bolstered by the lack of any evidence that he has ever before acted as an informant or otherwise assisted law enforcement in any capacity other than investigating an unrelated break-in of Mr. Ellison's own construction trailer.

Defendant cites *United States v. Barth*, 26 F. Supp. 2d 929 (W.D. Texas 1998) for the proposition that Mr. Ellison was acting as an agent for the government. The Court agrees with the government that defendant's reliance on *Barth* is misplaced for three reasons. First, that decision is not binding on this Court. *See Camreta v. Greene*, 563 U.S. 692, 709 n. 7 (2011) ("A decision of a federal district court judge is not binding

---

[3] Chief Smith speculated, at the invitation of defense counsel, that Mr. Ellison might have been motivated to take and view the USB device because he suspected it might contain illegal images and he might then intend to provide it to law enforcement officers to aid the government. There was no evidence from Mr. Ellison, however, that this was his motivation.

precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.") (citation and internal quotations marks omitted).

Second, that case is factually distinguishable because the private party in that case was acting as a confidential informant for the government at the time in other cases. *Barth*, 26 F. Supp. 2d at 332. Third, *Barth* is also distinguishable because that court found suppression was appropriate only for evidence obtained by the private party after the FBI instructed the informant to further search a computer hard drive. *Id.*, at 332-33. Here, as previously noted, Mr. Ellison had no prior relationship with law enforcement and no law enforcement officer directed him to seize or view the USB device.

Defendant points to the fact that Mr. Ellison was concerned about getting paid by defendant, and the fact that law enforcement officers did not search the USB device until after defendant paid Mr. Ellison, as somehow indicating that Mr. Ellison was acting as an agent for the government. This argument fails for many reasons. First, the Court finds credible the testimony by Mr. Ellison and Chief Smith that, although Mr. Ellison expressed a concern about receiving payment, and Chief Smith acknowledged it as a legitimate concern, law enforcement officers did not delay the search of the USB device to ensure defendant paid Mr. Ellison first. Second, there was no quid pro quo between the government and Mr. Ellison regarding any conduct by Mr. Ellison. Mr. Ellison had already engaged in all of the conduct that constituted a search and seizure of the USB device before any mention was made of wanting to be paid by defendant. Chief Smith did not direct Mr. Ellison to do anything, or refrain from any conduct, as a condition of law enforcement officers doing anything to ensure defendant paid Mr. Ellison. Finally, defendant, not the government, paid Mr. Ellison money, and defendant paid Mr. Ellison the money for services rendered in remodeling his house and not for anything to do with the taking and viewing of the USB device.

Finally, defendant argues that somehow the government's involvement in receiving the USB device from Mr. Ellison constitutes a violation of defendant's constitutional rights because, in defendant's opinion, Mr. Ellison's conduct in taking the USB device was itself illegal. Defendant contends that the private-party exception does not apply when the search and seizure results from a trespass or theft by the private party. This argument is without merit. The private-search exception applies "to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (quoting *Walter v. United States*, 447 U.S. 649, 662 (1980)); *see also United States v. Malbrough*, 922 F.2d 458, 462–63 (8th Cir. 1990) (upholding a search by a private citizen who trespassed on another's property and viewed marijuana). Here, the Court has found Mr. Ellison did not act as a government agent with the participation or knowledge of any government official when he took and viewed the USB device. Therefore, even if Mr. Ellison's conduct was illegal, it does not transform his private conduct into government action.

Accordingly, the Court finds that Mr. Ellison did not seize and search the USB device as an agent of the government and, therefore, the Court finds the government did not violate defendant's Fourth Amendment rights when Mr. Ellison took and viewed the USB device. Defendant's motion to suppress on this ground is therefore **denied**.

## C.     *Defendant's Motion to Suppress—Acceptance as Seizure Theory*

Defendant argues that the Court should suppress evidence because the government's acceptance and retention of the USB device for two days prior to obtaining a search warrant constituted an unlawful seizure. (Docs. 40-1, at 3-7). Defendant argues that the government "seized" the USB device from him without a warrant when it directed Mr. Ellison to deliver the USB device to the Monticello Police Department and then unreasonably held the USB device for two days before obtaining a court order authorizing

its seizure and search. (*Id.*) Defendant argues that there were no exigent circumstances that justified the warrantless seizure and the police officers could have and should have immediately obtained a warrant authorizing them to seize and hold the USB device. (*Id.*) Defendant acknowledges that contraband found in a public place may be seized by law enforcement officers without a warrant. (*Id.*, at 6). Defendant argues, however, that even if seized lawfully, the government was not permitted to hold it without a warrant. (*Id.*, at 6-7).

Defendant's argument raises two questions. The first question is whether the government's action in directing a private party to turn over an object the private party seized constitutes a government seizure at the time it is turned over. The second question is whether, if it is a seizure, the delay of two days before the government obtained a warrant was an unreasonable seizure under the Fourth Amendment.

A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *Jacobsen*, 466 U.S. at 113. The Fourth Amendment protection against unreasonable seizure extends to an individual's possessory interests in property, even if his expectation of privacy in that property has been completely extinguished. *Soldal v. Cook Co., Ill.*, 506 U.S. 56, 62–63 (1992). Indeed, "seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place." *Id.* at 68. As discussed in the prior section, however, the Fourth Amendment protects a person from unreasonable seizure by the government, not by a third party.

The question here is whether the government meaningfully further interfered with defendant's property interest in the USB device by having Mr. Ellison deliver it to Chief Smith and by holding it for two days. The Court finds the United States Supreme Court's decision in *Jacobsen*, 466 U.S. 109 (1984), to be instructive on this issue. In *Jacobsen*, the Supreme Court found that once a package (or in this case, a USB device) has been

opened and inspected by a private party, there is no longer a reasonable expectation of privacy in the package. 466 U.S. at 118-20. The Court analogized the situation to officers observing contraband in plain view and concluded that when the government subsequently searches a package seized and searched by a private party, it does not violate the constitution for the government to further seize and search the package so long as it is within the same scope as that committed by the private party. *Id.; see also United States v. Boyer*, 914 F.2d 144 (8th Cir. 1990) (holding that an agent did not violate the Fourth Amendment by searching a package that had been privately searched and then resealed before being turned over to the government). The loss of privacy interest in *Jacobsen* is analogous with the loss of possessory interest in this case. Here, the scope of the government's seizure, that is retention of the USB device, did not exceed the scope of Mr. Ellison's seizure of the item from defendant. Further, a two-day delay in obtaining a warrant did not meaningfully deprived defendant of a property right any more than had occurred in the first instance when Mr. Ellison seized the USB device from defendant.

Moreover, the Court does not find the retention of the USB device for two days before obtaining a warrant unreasonable. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991).

Here, the evidence showed that the delay in obtaining a warrant was because of an agent's illness. Chief Smith immediately contacted the DCI when he came into possession of the USB device. His decision to involve the DCI, with their greater expertise and resources for dealing with this type of evidence and criminal conduct, was reasonable. The DCI immediately assigned an agent to the case. When that agent's illness prevented him from acting and continued into a third day, the DCI reassigned the case to a new agent, who immediately acted and obtained a warrant on the same day. Importantly, there was also probable cause to believe the USB device constituted

contraband; that is, that the USB device contained child pornography.[4] There is nothing unreasonable about the government's conduct in temporarily holding the USB device until the DCI could take over the investigation and apply for a warrant under these circumstances. *See, e.g.*, *United States v. Johns*, 469 U.S. 478, 484-86 (1985) (finding that a delay of three days between seizure of packages for which there was probable cause to believe they contained contraband and the search was reasonable); *Jacobsen*, 466 U.S. at 120 (holding that the government may temporarily seize containers containing suspected contraband without a warrant after they have been searched by a private party); *United States v. Place*, 462 U.S. 696, 706 (1983) (finding that temporary, warrantless investigative detentions of luggage are justified under the Fourth Amendment, provided they are based on a reasonable, articulable suspicion that the luggage contains contraband); *cf. Cardwell v. Lewis*, 417 U.S. 583, 592-593 (1974) (impoundment and 1-day delay did not make examination of exterior of vehicle unreasonable even when it could have been done on the spot).

The government's temporary retention of the USB device in this case was also justified because they had probable cause to believe it contained contraband, knew defendant was looking for it, and could reasonably believe defendant would destroy it if they returned the USB device to him. "Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the [Fourth] Amendment to permit seizure

---

[4] Notably, it is well established that "[l]aw enforcement authorities must [only] possess a reasonable suspicion based on articulable facts that a package contains contraband before they may detain the package for investigation." *United States v. Johnson*, 171 F.3d 601, 603 (8th Cir. 1999); *see also United States v. Terriques*, 319 F.3d 1051, 1056 (8th Cir. 2003) ("A seizure will not violate the Fourth Amendment if the authorities have reasonable suspicion based on articulable facts that a package contains contraband …." (quotation marks and citation omitted)). Here, there was at least a reasonable, articulable suspicion that the USB device contained contraband based upon Mr. Ellison's statements.

of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *United States v. Clutter*, 674 F.3d 980, 985 (8th Cir. 2012), quoting *Place*, 462 U.S. at 701. The government had probable cause to believe the USB device contained contraband based on Mr. Ellison's description of its contents. "The exigencies of the circumstances also demanded continuing seizure" to preserve the evidence. *See United States v. Goodale*, 738 F.3d 917, 922 (8th Cir. 2013) (holding that the government's two-day retention of a laptop believed to contain child pornography was reasonable, pending obtaining a warrant, because the defendant "knew about the investigation and could destroy the evidence."). Here, the government had probable cause to believe the USB device contained contraband, knew defendant was looking for it, and would have had reason to believe that if they returned the USB device to him that he would destroy it.

The exclusionary rule is intended to punish the police and deter them from violating the constitution. The rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v. Calandra*, 414 U.S. 338, 348 (1974). In *Michigan v. Tucker*, 417 U.S. 433, 447 (1974), the Supreme Court explained:

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.

*See also United States v. Peltier*, 422 U.S. 531, 539 (1975) ("If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."). Where, as here, the government diligently pursued its investigation, and its conduct was not unreasonable under the totality of the circumstances, suppression is inappropriate.

Defendant cites *United States v. Walker*, 324 F.3d 1032 (8th Cir. 2003) and *United States v. Demos*, 279 F.3d 632 (8th Cir. 2004), for the proposition that the government unreasonably seized the USB device when Chief Smith directed Mr. Ellison to deliver the USB device to the police department. The Court finds those cases distinguishable. In *Walker*, a postal inspector removed a package from the mail stream, believing it may have contained contraband. *Walker*, 324 F.3d at 1035-36. *Demos*, which involved a police officer at an airport removing a package from checked luggage, is distinguishable for the same reasons. *Demos*, 279 F.3d at 634. In both of these cases, the government, not a private party, effectuated the initial seizure. In neither of these cases was there probable cause to believe the packages contained contraband at the time of the government seizure. Finally, neither case addressed the issue of reasonable delay between seizure of the package and obtaining a warrant.

Accordingly, the Court finds that the government's conduct in obtaining the USB device from Mr. Ellison and holding it for two days before obtaining a warrant did not violate defendant's Fourth Amendment rights. Defendant's motion to suppress on this ground is therefore **denied**.

### D. *Defendant's Motion to Suppress—Lack of Probable Cause Theory*

Defendant argues that the Court should suppress evidence because the warrant for the USB device lacked probable cause. Defendant argues that the warrant was supported

only by "bare conclusions" by Mr. Ellison that the USB device contained child pornography. (Doc. 13, at 3-5). Further, defendant asserts that even assuming, based on Mr. Ellison's description, the USB device contained videos showing nude children, that child nudity alone is not child pornography. (*Id.*). Defendant asserts this same defect impairs the search warrants for his homes. (*Id.*).

Defendant's focus on whether the images, as described by Mr. Ellison, would legally constitute "child pornography" under federal law is misplaced. The state agents here applied for a state search warrant asserting violations of state law. Although Special Agent Kedley did not specifically identify the crimes under investigation by section number, Special Agent Kedley applied for search warrants asserting probable cause to believe the items to be searched would contain evidence that defendant "inappropriately, secretly, and unlawfully manufactured videos and images of youth (sic) males" (Doc. 54-3, at 3) and "child pornographic images, child pornographic videos, additional victims who either knowingly or unknowingly were video recorded by STEPHEN and have been subjected to the unlawful manufacturing of child pornography and invasion of privacy" (Docs. 54-4, at 5; 54-5, at 5). Iowa Code Section 728.12 makes it a crime to "possess a visual depiction of a minor engaging in a prohibited sexual act . . . ." Iowa Code Section 728.1(7)(g) includes within the definition of a "prohibited sex act" "[n]udity of a minor for the purpose of arousing or satisfying the sexual desires of a person who may view a visual depiction of the nude minor." Moreover, Iowa Code Section 709.21 makes it a crime to photograph or film another person, "for the purpose of arousing or gratifying the sexual desire of any person," if it is done without the other person's consent, the person is fully or partially nude, and the person had a reasonable expectation of privacy while in that state. The affidavits in support of the search warrants demonstrate probable cause to believe the items to be searched would contain evidence of these state crimes.

Further, the question is not whether the images would, in fact, constitute child pornography but whether the totality of the circumstances would establish probable cause to believe that child pornography would be found on the USB device and defendant's other electronic device. "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." *Hill v. California*, 401 U.S. 797, 804 (1971). Probable cause does not require evidence to prove a crime beyond a reasonable doubt, or even by a preponderance of the evidence. *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007). Here, the search warrants were supported not only by a description of the images on the USB device, but also by other circumstantial evidence which suggested that it and other devices might contain child pornography. These circumstances included the fact that the images were taken by a hidden USB device, Mr. Ellison's previous observation of defendant in possession of pornographic images of young males, defendant's connection with a youth basketball organization, and the fact that defendant had organized the videos in file folders under male first names.

Finally, even were this Court to find that the affidavits failed to establish probable cause for the searches, state court judges found they did. Suppression of the evidence, therefore, is not appropriate when, as here, the agents relied in good faith on the judgment of judicial officers in finding probable cause. *See United States v. Leon*, 468 U.S. 897, 922 (1984). For an agent to act in bad faith under *Leon*, the warrant would have to be "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923. In this case, the Court finds that the affidavits were not so lacking in indicia of probable cause to lead to the conclusion that the agent was acting in bad faith in applying for the warrant. This is particularly true with respect to the state law crime of invasion of privacy.

Accordingly, the Court finds that the search warrants were supported by probable cause related to violations of state law. In the alternative, the Court finds that even if the

warrants lacked probable cause, the agent acted in good faith reliance on state judges' conclusions that the warrants were supported by probable cause. Defendant's motion to suppress on this ground is therefore **denied**.

### E.    *Defendant's Motion to Suppress—Overbroad, General Search Theory*

Defendant argues that the Court should suppress evidence because the warrants for both the USB device and defendant's homes were overbroad, general warrants. Defendant argues that the warrant for the USB device "did not put any limits" on the search and constituted a "general warrant." (Doc. 12-1, at 5). Defendant argues that the warrant "should have been limited to a search for the files that Ellison reported that he had seen," and that "authorizing the search of the entire USB device infringed on [defendant's] privacy and was unreasonable." (*Id.*, at 6.). Defendant claims this is particularly so because a USB device is like a computer that contains thousands of files and could be full of private information. (*Id.*). In an alternative argument, defendant claims that the officers exceeded the scope of the warrant by conducting "a complete forensics examination" of the USB device. Specifically, defendant argues that warrant did not authorize opening and viewing the files; rather, it only permitted "extracting and cloning data" and "copying" that data. (Doc. 40-1, at 8-9). Defendant further argues that the warrants for his homes were also too broad because they authorized the search of "any and [sic] electronic device found . . . of any kind" in the homes. (Doc. 12-1, at 7).

The Fourth Amendment prohibits general search warrants and requires a description, with particularity, of places to be searched and the items to be seized. *Andresen v. Maryland*, 427 U.S. 463, 480 (1976). "'The purpose of the particularity requirement is to prevent a general exploratory rummaging through a person's belongings.'" *United States v. Mosby*, 101 F.3d 1278, 1281 (8th Cir. 1996) (quoting *United States v. Hibbard*, 963 F.2d 1100, 1102 (8th Cir. 1992)). An affidavit may

provide the necessary particularity for a warrant if it is incorporated into the warrant, attached to the warrant, or present at the search. *Rickert v. Sweeney*, 813 F.2d 907, 909 (8th Cir. 1987). The standard used to gauge the particularity requirement of a search warrant is one of "'practical accuracy' rather than a hypertechnical one." *United States v. Summage*, 481 F.3d 1075, 1079 (8th Cir. 2007) (quoting *United States v. Peters*, 92 F.3d 768, 769-70 (8th Cir. 1996)). In short, for a warrant to be valid "there must be evidence of a nexus between the contraband and the place to be searched . . .." *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000).

Regarding the USB device, the Court finds that the search warrant was neither too broad, nor did the search exceed the scope of the warrant. Defendant argues that the agents should have searched only the files that Mr. Ellison viewed, but Mr. Ellison indicated he viewed all of the files on the USB device. There is nothing in the record suggesting that Mr. Ellison described only searching part of the USB device or only certain files. Defendant has failed to identify in what manner he believes the warrant could have been limited on this ground. In any event, a magistrate judge authorized this search.[5] Therefore, the *Leon* good faith exception applies to the assertion that the warrant was overbroad with the same force and effect as it does to the assertion that the warrant lacked probable cause. Finally, the warrant authorized a "complete forensic examination of the video recording device." (Doc. 54-3). A complete forensic examination would include opening and viewing the videos under any common sense meaning of the phrase.

Regarding the search of defendant's homes and electronic devices in those homes, the Court again finds the warrants were not overbroad, general warrants. The nature of the evidence being sought in this case, photographs and videos of naked children, dictates

---

[5] The Court further notes that a USB videotape device is not like a computer in the sense that it is not likely to contain thousands of files of otherwise personal information. In that regard, and others, defendant's reliance on *United States v. Lichtenberger*, 786 F.3d 478, 485-91 (6th Cir. 2015), is misplaced.

the scope of the search. Such images could be located on any type of electronic storage device described in the warrants and a search of such devices for such images was therefore justified. *See United States v. Rector*, No. 08-50015, 2013 WL 5929961, at *4 (W.D. Ark. Nov. 1, 2013) ("Because such evidence [of child pornography] might be stored on an object as small as a thumb drive, an extremely wide-ranging search was justified by both the object of the search and the places in which there was probable cause to believe that it might be found."); *see also, e.g.*, *United States v. Alexander*, 574 F.3d 484, 489-90 (8th Cir. 2009) (holding that a search warrant was not facially overbroad when it authorized the search of "digital storage devices" and other items, including defendant's computer, despite the fact that "there was no evidence that [defendant's] computer was used in making the surreptitious recordings," finding "it was a fair inference that illicit recordings of people in a state of nudity or sexual activity would be found stored on digital devices."); *United States v. Cartier*, 543 F.3d 442, 447-48 (8th Cir. 2008) (rejecting defendant's general warrant argument, finding agents' search of thirteen hard drives, two thumb drives, and hundreds of compact discs and videotapes for child pornography was not overbroad and that agents did not have to develop a search protocol to avoid viewing other personal information); *Summage*, 481 F.3d at 1079-80 (finding a warrant authorizing the search and seizure of all videotapes and DVDs, pornographic pictures, video and digital recording devices and equipment, all equipment that is used to develop, upload, or download photographs and movies, and computers was not overbroad "[b]ecause no indication was given regarding the nature of the format in which the sought-for video and photographs were created or stored, it was necessary to search a broad array of items for the relevant materials.").

In this case, the USB device had to be hooked up to a computer to view the videos and to organize them into files. It was reasonable, therefore, for the agents and the Court to believe defendant used computers or other electronic devices for those purposes. *See*

*United States v. Flanders*, 468 F.3d 269, 271–72 (5th Cir. 2006) (holding that use of digital camera to photograph a naked child supported probable cause to search a computer). Finally, the Court again finds that the *Leon* good faith exception to the exclusionary rule would apply to this issue; a judge authorized the search and the scope of the items to be searched was not so clearly overbroad that the agent could not rely in good faith on a judge's authorization of the search.

Accordingly, the Court finds that the search warrants were not overbroad, general warrants, and that the agents did not exceed the scope of the warrant for the USB device by opening and viewing videos on it. Defendant's motion to suppress on this ground is therefore **denied**.

### F.    *Defendant's Motion to Suppress—Franks Theory*

Defendant argues that the Court should suppress evidence because Special Agent Kedley made materially false and misleading statements in the affidavits in support of the search warrants. In particular, defendant argues that Special Agent Kedley: (1) "repeated[ly] mischaracterize[ed] the contents of the USB device" because he described the USB device as containing videos of "young men showering" when Mr. Ellison only described the videos of "teenage boys who were partially clothed using the shower" (Doc. 41-1, at 4); (2) "repeatedly referred to the contents of the USB device as 'child pornography'" (*Id.*); and (3) "misleadingly suggested that the USB device contained images of lewd and lascivious exhibitions of genitals and also falsely directly asserted that the device contained images of child pornography." (Doc. 44, at 1). Defendant claims the USB device only showed minor boys in states of "mild nudity" of which he had a First Amendment right to possess, and did not constitute child pornography, as defined by federal law. (Doc. 41-1, at 5).

"In order to be entitled to a hearing under *Franks* the defendant must make a 'substantial preliminary showing' of a false or reckless statement or omission and must

also show that the alleged false statement or omission was necessary to the probable cause determination." *United States v. Milton*, 153 F.3d 891, 896 (8th Cir. 1998) (citing *United States v. Fairchild*, 122 F.3d 605, 610 (8th Cir. 1997)). "Allegations of negligence or innocent mistake are insufficient." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). "Such a showing is not easily made." *United States v. Engler*, 521 F.3d 965, 969 (8th Cir. 2008); *see also Milton*, 153 F.3d at 896 ("The 'substantial preliminary showing' requirement needed to obtain a *Franks* hearing is not lightly met"). *See United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998) ("A mere allegation standing alone, without an offer of proof in the form of a sworn affidavit of a witness or some other reliable corroboration, is insufficient to make the difficult preliminary showing [under *Franks*]."); *Franks*, 438 U.S. at 171 ("Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained."); *see also Engler*, 521 F.3d at 970 (affirming denial of *Franks* hearing requested on basis of officer's omissions, noting that defendant made "assertions without any supporting proof that they [were] accurate . . . provided no evidence to establish that . . . officers deliberately or recklessly omitted information . . . [and] did not provide an explanation for the absence of such evidence").

The Court finds that defendant failed to carry his burden of making a substantial preliminary showing and is, therefore, not entitled to a *Franks* hearing.[6] Defendant came forward with absolutely no evidence to support his assertion that Special Agent Kedley intentionally or recklessly made false or misleading statements in the affidavits in support

---

[6] The Court notes that, over the government's objection and because the agent was present and available, the Court allowed defendant to call Agent Kedley to testify at the suppression hearing. After the hearing, defense counsel stated that they would not have presented any other evidence had the Court, in advance of the suppression hearing, made a finding that defendant was entitled to a *Franks* hearing. So, in a very real sense defendant received a *Franks* hearing, even though the Court finds he was not entitled to one.

of the search warrants. It is not enough for defendant to simply allege misconduct. *See Mathison*, 157 F.3d at 547–48 (holding that conclusory allegations of falsehood are insufficient to make a substantial preliminary showing that a false statement was intentionally or recklessly included in the affidavit). Nor does the Court find that any of the statements made by Special Agent Kedley were, in fact, false or misleading.

Special Agent Kedley's description of the videos showing the boys showering was not a material misrepresentation. A representation is "material," in the *Franks* context, only if the correct information may have made "a probable cause finding unsupportable." *United States v. Williams*, 477 F.3d 554, 558 (8th Cir. 2007); *see also United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993) ("'Only if the affidavit as supplemented by the omitted material could not have supported the existence of probable cause' will suppression be warranted.") (quoting *United States v. Lueth*, 807 F.2d 719, 726 (8th Cir. 1986)). Chief Smith conveyed to Special Agent Kedley Mr. Ellison's description of what the videos showed: boys disrobing, going in the shower dry, and coming out wet. Although the videos apparently do not actually show the boys showering, it was not a material misrepresentation for Special Agent Kedley to describe the video as showing the boys showering. The material part of the description was the nudity of young boys; the shower was simply the setting for the nudity. A more precise description of what the videos actually showed of naked boys going into a shower dry and coming out wet would not have affected the probable cause determination.

Contrary to defendant's assertion, Special Agent Kedley did not claim anywhere in any affidavit that the videos contained lewd or lascivious exhibition of genitals. The Court understands defendant's argument to be that by describing the videos as constituting child pornography, the agent incorporated the federal statutory definition which, depending on the statute, may require a showing of lewd or lascivious exhibition of genitals. There are two problems with this line of reasoning. First, as noted previously,

Special Agent Kedley was applying for state warrants for violations of state law (including invasion of privacy), which do not incorporate the federal definition of child pornography. Second, the affidavits do not state, as a fact, that the videos contained child pornography. Rather, Special Agent Kedley accurately and factually described the contents of the videos, then in the form of a conclusion made reference to likely finding evidence of child pornography during the searches. In context, therefore, at most Special Agent Kedley's reference to child pornography, both in the written affidavit and orally to Judge Thornhill as referenced in the endorsements to the home search warrants, reflected his opinion of what crimes he believed were reflected by the images on the USB device, or may have been found upon searching that and other electronic devices in defendant's possession. Given the nature of the videos as factually described, and the secretive nature of the recording device, that was not an unreasonable opinion. It was not a material misrepresentation of fact.

Accordingly, the Court finds that defendant has not made a substantial threshold showing entitling him to a *Franks* hearing because he came forward with no evidence to demonstrate that Special Agent Kedley intentionally or recklessly made materially false or misleading statements of fact. In the alternative, the Court finds that Special Agent Kedley did not make any materially false or misleading statement of fact. Defendant's motion to suppress on this ground is therefore **denied**.

### G. Government's Motion to Strike

The government moves to strike defendant's supplemental motion for a *Franks* hearing at Doc. 44. (Doc. 48). The government argues the supplemental motion (1) was untimely; (2) falsely alleges the affidavits claimed the videos contained lewd and lascivious exhibition of genitals; and (3) attaches a late, irrelevant report by defendant's unqualified expert. (Doc. 48). Because the Court finds that defendant's motion to suppress based on the *Franks* allegation fails on its merits, the Court denies as moot the

government's motion to strike the supplement to the motion. The Court agrees, however, that defendant's expert's opinion about whether, in his view, the images constitute child pornography under federal law is irrelevant. It is irrelevant because, as noted, the applications for search warrants were for violation of state law, not federal law. It is also irrelevant because it does not matter what defendant's expert thought about the images after the fact. The relevant inquiry was whether Special Agent Kedley intentionally or recklessly made a materially false or misleading statement of fact at the time he applied for the search warrant. The Court has found he did not.[7]

Therefore, the Court **denies as moot** the government's motion to strike. (Doc. 48).

## IV. CONCLUSION

For the reasons set forth above, defendant's motions to Dismiss (Doc. 11), to Suppress (Docs. 12, 13), and for a *Franks* hearing (Doc. 41), are **denied,** and the government's Motion to Strike (Doc. 48) is **denied as moot.**

**IT IS SO ORDERED** this 4th day of October, 2018.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

---

[7] The Court takes no position at this time whether defendant's expert is qualified to opine as to whether the images on the USB device constitute child pornography under federal law.